**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IVY CREEK OF TALLAPOOSA LLC d/b/a LAKE MARTIN COMMUNITY HOSPITAL, and ELMORE COMMUNITY HOSPITAL RURAL HEALTH ASSOCIATION d/b/a ELMORE COMMUNITY HOSPITAL, <br><br> Plaintiffs, <br><br> v. <br><br> MULTIPLAN, INC., <br><br> Defendant. | No.  1:24-cv-03900 <br><br> **CLASS ACTION COMPLAINT** |

Plaintiffs Ivy Creek of Tallapoosa LLC d/b/a Lake Martin Community Hospital ("Lake Martin Community Hospital") and Elmore Community Hospital Rural Health Association d/b/a Elmore Community Hospital ("Elmore Community Hospital") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint to recover treble damages, injunctive relief, and/or other relief as appropriate, based on violations of the Sherman Act and state antitrust laws against MultiPlan, Inc. ("MultiPlan").[1]

## INTRODUCTION

1.      Insurer Co-Conspirators all offer health insurance plans that economically steer patients into seeking care from a health care provider ("HCP") on an insurer's preferred or "in-network" list, usually through lower out-of-pocket costs to the patient.[2]  However, whether because of choice or circumstance,[3] patients often receive care from providers not on an insurer's preferred list, on what is commonly known as an out-of-network ("OON") basis.  Providers submit invoices for OON care to Insurer Co-Conspirators, who then pay those bills, passing a certain amount on to the patient.[4]  This action arises from Multiplan and Insurer Co-Conspirators' conspiracy to constrain, fix, stabilize, and artificially suppress reimbursement rates for OON health care services.

---

[1]      Aetna, Inc. ("Aetna"), Elevance Health, Inc. ("Elevance"), Centene Corporation ("Centene"), The Cigna Group ("Cigna"), Health Care Services Corporation ("HCSC"), UnitedHealth Group, Inc. ("UHC"), Kaiser Permanente, LLC ("Kaiser") and Humana, Inc. ("Humana") are collectively referred to herein as the "Insurer Co-Conspirators."  *See* ¶¶11-18, *supra*.

[2]      These preferred provider lists are commonly referred to as Preferred Provider Organizations, or "PPOs".

[3]      Patients are often forced out of network in emergencies, or when seeking care that is often provided on an OON basis, such as addiction treatment.

[4]      Under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §§1395dd(a)–(b), (d), and (h), hospitals and physicians who staff emergency medical departments have a duty to "provide for an appropriate medical screening examination" when an individual comes to the emergency department.  If "the individual has an emergency medical condition," then they are required to "stabilize the medical condition" without inquiry into "the

2.      Plaintiffs are hospitals that frequently provide OON healthcare services to patients. In doing so, Plaintiffs are forced to submit invoices for OON healthcare services to Insurer Co-Conspirators.   In nearly every instance, Plaintiffs are offered reimbursement for these services at a tiny fraction of the invoiced amount.  In virtually every instance, Plaintiffs are forced to accept these artificially suppressed reimbursements.

3.      At the center of this conspiracy is MultiPlan, a firm that provides several tools powered by machine learning and artificial intelligence that are utilized by the Insurer Co-Conspirators   to systematically "reprice" reimbursements made for OON healthcare services rendered by health care providers ("HCPs").  Multiplan has acquired nearly all of its competitors over the past 20 years.

4.      The scheme can be simply summarized: if all of the Insurer Co-Conspirators stopped offering competitive OON reimbursement rates and instead used MultiPlan's tools to determine what they would pay for OON claims, reimbursement rates would drop market-wide, and everyone would make more money.  As described below, that is exactly what has happened, and the conduct alleged herein has directly caused Plaintiffs and the Class to receive artificially suppressed payments – underpayments likely amounting to billions of dollars on a class-wide basis – for OON healthcare services provided since at least July 1, 2017.   The conspiracy described herein continues to date.

---

individual's method of payment or insurance status."  Id.  After it has provided the care required by EMTALA, the health care provider frequently must rely on Insurer Co-Conspirators to fairly reimburse them for OON charges.

## PARTIES

### I.  PLAINTIFFS

5.     Plaintiff Lake Martin Community Hospital is an Alabama Limited Liability Company with its principal place of business in Tallapoosa County, Alabama.

6.     Plaintiff Elmore Community Hospital is an Alabama Non-Profit Corporation with its principal place of business in Elmore County, Alabama.

7.     Plaintiffs provide hospital in patient and outpatient hospital services, including emergency medicine, general surgery, ENT, ophthalmology, podiatry, endoscopy, and pain management.   Plaintiffs provide out-of-network healthcare services at its locations and has had out-of-network claims repriced by one or more Defendants during the Class Period, including within the four years preceding the filing of this Complaint.

### II.  DEFENDANT

8.     Defendant MultiPlan is a New York corporation with its principal place of business located at 115 Fifth Avenue, 7th Floor, New York, NY 10003.   MultiPlan is wholly owned by MultiPlan Holding Corporation.  The ultimate parent company of MultiPlan Holding Corporation is MultiPlan Corporation, which is a publicly traded entity.   MultiPlan has numerous subsidiaries. In 2010, Multiplan Corporation acquired Viant, Inc. ("Viant"), a healthcare cost management company incorporated in Delaware with its principal place of business in Illinois.   In 2011, MultiPlan acquired National Care Network, LP and its affiliate National Care Network, LLC, both healthcare cost management companies incorporated in Delaware and headquartered in Texas.  In October 2020, Churchill Capital Corp. III and its related entities acquired MultiPlan and its related entities.  Churchill Capital Corp. III is a special-purpose acquisition company created to raise funds to take a private company public.  It is incorporated in Delaware and headquartered in New York.

After completing the acquisition of MultiPlan and its related companies, Churchill Capital Corp. III changed its name to MultiPlan Corporation.

9.      Defendant MultiPlan is also liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

10.     The conspiracy includes, at all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendant in its unlawful and illegal conduct.  Some of those co-conspirators are identified below.  Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein.  The individuals and entities acted in concert through, amongst other things, joint ventures, and by acting as agents for principals in order to advance the objectives of the scheme to benefit Defendant, Insurer Co-Conspirators, and themselves through use of MultiPlan's repricing tools for the artificial suppression of OON reimbursement rates.  Defendants are jointly and severally liable for all acts or omissions of the co-conspirators.

## III.    INSURER CO-CONSPIRATORS

11.     Aetna is a Delaware corporation that is headquartered in Hartford, Connecticut.  Aetna is one of the largest commercial health insurance payors in the United States.  It has a commercial insurance network that pays in-network and OON claims from healthcare providers in all 50 states and the District of Columbia.  Aetna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States.  Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

12.     Elevance Health (formerly known as Anthem, Inc.) is an Indiana corporation with a principal place of business in Indianapolis, Indiana.  Elevance is a member of the Blue Cross and Blue Shield Association, a joint venture of insurance companies that work together to offer their members access to a nationwide network of healthcare providers.  Elevance licenses certain trademarks and service marks from the Blue Cross and Blue Shield Association in 14 states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, most of Missouri, Nevada, New Hampshire, parts of New York, Ohio, Virginia (except the Washington, D.C. suburbs), and Wisconsin.  Elevance is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States.  Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

13.     Centene is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Centene is the parent company of many commercial health insurance plans and prescription drug plans that operate in the United States.  Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

14.     Cigna is a corporation organized under the laws of the State of Delaware, with its principal place of business in Bloomfield, Connecticut.  Cigna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States.  Those plans issue insurance or provide administrative

services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

15.     HCSC is organized as a mutual reserve company under the laws of the state of Illinois with a principal place of business in Chicago, Illinois. HCSC is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States, including in Illinois, Montana, New Mexico, Oklahoma, and Texas. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

16.     UHC is a Delaware corporation with a principal place of business in Minnetonka, Minnesota. UHC has two divisions: UHC, which provides health benefits plans, and Optum, which provides health services, including pharmacy benefit manager services. UHC is a vertically integrated healthcare enterprise with a portfolio of wholly owned subsidiaries comprising a massive healthcare ecosystem. UHC has a commercial insurance network that pays in-network and OON claims from healthcare providers in all 50 states and the District of Columbia. UHC's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

17.     Humana is a Delaware corporation with its principal place of business in Louisville, Kentucky. Humana is the parent company, or otherwise affiliated or related company, to various

commercial health insurance plans and prescription drug plans that operate in the United States. The plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans.

18.     Kaiser is a California corporation headquartered in Oakland, California, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) Medicare Advantage plans, and (4) Medicaid plans.

19.     Aetna, Elevance, Centene, Cigna, HCSC, UHC, Humana, and Kaiser have all entered into an OON repricing agreement with MultiPlan, participated in the conspiracy, and performed acts and made statements in furtherance of the conspiracy.

## JURISDICTION & VENUE

20.     This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §26) and antitrust laws of various states to recover treble damages and cost of suit, including reasonable attorneys' fees, for injuries sustained by Plaintiffs and the putative Class; to enjoin Multiplan and Insurer Co-Conspirators' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States.  This action is for compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1337; Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15(a), 26); and 28 U.S.C. §1332(d) because

this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a state different from MultiPlan.

22.     This Court has jurisdiction over MultiPlan based on MultiPlan's activities within Illinois, including in this District.  During the Class Period, each of the Insurer Co-Conspirators has reimbursed HCPs for OON health care services provided in Illinois, including in this District, and Multiplan's tools have been used by some or all Insurer Co-Conspirators to determine the reimbursement rate for those OON claims.  Further, pursuant to 15 U.S.C. §22, MultiPlan "may be found or transact[] business" in this District.

23.     MultiPlan's activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States.  MultiPlan's products and services are sold in the flow of interstate commerce.

24.     By reason of the unlawful activities alleged herein, Multiplan and Insurer Co-Conspirators' unlawful activities substantially affected commerce throughout the United States. Multiplan and Insurer Co-Conspirators, directly and through their agents, engaged in activities affecting all states.

25.     The conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiffs and members of the Class.

**FACTUAL ALLEGATIONS**

26.     Prior to the conspiracy alleged here, MultiPlan and other healthcare insurance payors made independent decisions about how much they would pay for OON medical services, at what was known as "usual and customary" or "reasonable and customary" rates.  Traditionally, Insurer Co-Conspirators determined their own "usual and customary" rate, by relying on a

combination of independent benchmarking databases that aggregated historical information and their own views of the competitive marketplace. Each insurance company had a competitive incentive to pay reasonable reimbursement amounts to ensure HCPs could continue to provide non-emergency OON services to their insureds that HCPs could otherwise reject. Over time, despite consistently reasonable costs, paying a competitive OON rate became a "pain point" for health insurers.

27.     In the mid-2000's, shortly after being acquired by a private equity group, MultiPlan launched a new data analytics business unit.[5]  To expand the new business, MultPlan began acquiring a series of companies that had developed data analytics tools designed to "reprice" OON claims submitted by HCPs.[6]

28.     Using data analytics, and more recently, artificial intelligence,[7] these tools are designed to suppress market-wide reimbursement rates for OON healthcare services.  Thus, "reprice" is an intentionally misleading description.  What MultiPlan's process was designed to do – and what Multiplan marketed it as able to do – is systematically push OON healthcare service reimbursement rates down, and thereby increase insurer profits.

29.     MultiPlan knows that its repricing tools, if used in isolation, provide little value. So MultiPlan pitched its repricing tools to Insurer Co-Conspirators as an OON "cost containment" solution.

---

[5]     MultiPlan called this business pivot "MultiPlan 2.0."

[6]     In 2009, MultiPlan acquired Viant, a competing OON repricing tool.  In 2011, MultiPlan acquired National Care Network LLC ("NCN") and NCN's "Data iSight" repricing tool.  According to MultiPlan's former CEO, Data iSight soon "became the foundation of [MultiPlan's] analytics business."  In 2014, MultiPlan acquired repricing technology provider Medical Audit & Review Solutions ("MARS").  In 2023, MultiPlan acquired artificial intelligence company Benefits Science Technologies ("BST").

[7]     Around June 2023, MultiPlan introduced a new "AI-enabled" OON claim repricing methodology known as "Pro Pricer."  MultiPlan claims that this tool will reprice OON claims for competing health insurance networks using over 40 years of pricing data.

30.     MultiPlan hosted promotional events designed to facilitate industry-wide agreement to use MultiPlan's repricing methodology, including "advisory board" meetings at luxury resorts and "road shows" where MultiPlan executives met with the executives of competing healthcare networks to discuss how well MultiPlan's methodology suppresses OON reimbursement payments and brainstorm ways to make the anticompetitive scheme even more effective. MultiPlan also issued secret "white papers" to its competitors explaining how MultiPlan's methodology suppresses claim reimbursement.  And MultiPlan directly communicated with health insurers to solicit those payors to join the conspiracy.

31.     MultiPlan's efforts to recruit its competitors to join this anticompetitive scheme were wildly successful.  Once Insurer Co-Conspirators were no longer bound by their settlement agreements stemming from prior efforts to fix the OON reimbursement market,[8] MultiPlan reached successive agreements with several major U.S. healthcare insurers; each agreed to give MultiPlan access to its confidential OON reimbursement data in exchange for the use of MultiPlan's OON repayment suppression tools.

32.     Every additional insurer that agreed to use MultiPlan's tools removed a formerly independent decision maker from the OON reimbursement market.  Once UHC, the United States' largest health insurance company, joined the conspiracy on July 1, 2017, Multiplan's tools could effectively price the entire market, eliminating the need for Insurer Co-Conspirators to compete on OON reimbursement rates.   UHC was explicit about its plans to use Multiplan's tools to suppress its OON reimbursement rates, or as UHC phrased it, to "bring [UHC] back into alignment with its primary competitor groups Blues, Cigna, Aetna on managing out-of-network costs."

---

[8]     *See infra*, ¶¶76-88.

33. MultiPlan's anticompetitive scheme is straightforward. In exchange for their use of Multiplan's tools, Insurer Co-Conspirators agree to share their confidential, highly detailed OON invoice and reimbursement data with MultiPlan in near real-time.[9]

34. When an Insurer Co-Conspirators receives an invoice for OON healthcare services, it sends the invoice to MultiPlan. MultiPlan's repricing tools, with insight into all of Insurer Co-Conspirators' confidential OON payment information,[10] then use AI to generate an offer of payment for the invoiced OON services on behalf of the Insurer Co-Conspirators.[11] Once MultiPlan has calculated a reimbursement rate using its AI-based repricing process,[12] it sends the "repriced" offer of payment back to the HCP.[13] In these communications, MultiPlan typically notes that it is working with the health insurer, often the Insurer Co-Conspirators, to reprice the OON claim.

35. Occupying the functional role of a buyer's agent collectively negotiating on behalf of nearly the entire market of OON service buyers, Multiplan's tools are designed to exert the

---

[9] MultiPlan executives have admitted that they are "stewards" of "12 petabytes" [12PB = 12,000TB = 12,000,000GB] of their clients', including Insurer Co-Conspirators', proprietary reimbursement data.

[10] Multiplan executives have admitted that their tools "see data across 700 payers" and that Multiplan's master dataset is "much, much larger and more diverse than what any single payer has within their system."

[11] Insured Defendants' OON reimbursement data is fed into MultiPlan's "Claims Savings Engine," known internally as FRED. FRED routes OON invoices to one of several proprietary algorithms owned by MultiPlan, including Data iSight, Viant, Pro Pricer, and MARS. Those algorithms then use FRED's full data set, which includes OON reimbursement data from the payor's competitors, to determine how little MultiPlan can offer a HCP for the good or service in question and still have that offer accepted.

[12] The precise method and process by which MultiPlan's tools calculate suppressed OON reimbursement rates is both highly confidential and generally irrelevant. More important is the manner in which Multiplan has structured its analytics business. Multiplan executives have explained to investors that Multiplan "build[s their] algorithms on a much larger data lake" than any individual OON payor could, and as a result, Multiplan's "products generate bigger savings" than any individual OON payor could generate alone. This is an admission that by training its algorithms on data from all of the Insurer Co-Conspirators, Multiplan's tools can influence OON reimbursement rates marketwide.

[13] While the precise pricing methodology will be revealed in discovery, upon information and belief, Plaintiffs understand Multiplan's tools generally function by first attempting to estimate the HCP's actual cost of providing the OON product or service in question, then generating an offer to pay the HCP some multiple of Multiplan's estimate of the HCP's actual cost. In other words, through their use of Multiplan's tools, Insurer Co-Conspirators have agreed upon a fixed, across-the-board profit margin that they will allow HCPs to realize on their provision of OON healthcare.

collective market power of its subscribers, including Insurer Co-Conspirators. As a result, the reimbursement offers generated by Multiplan are lower than any Insurer Co-Conspirators would otherwise pay in a competitive market.

36.     Because MultiPlan enlisted virtually every significant healthcare insurer to participate in its anticompetitive scheme,[14] HCPs are forced – against their will - to accept these artificially suppressed repriced reimbursements. Indeed, MultiPlan has estimated that healthcare providers accept the reimbursement amounts MultiPlan imposes for OON inpatient services 99.4% of the time. Even in the cases where MultiPlan offers to "negotiate," that negotiation is a one-sided sham.[15]

37.     MultiPlan also effectively forces the suppressed price on the invoicing HCP by providing small, functionally useless windows of time to respond to the "repriced" claim. MultiPlan knows that by bombarding healthcare providers with a constant stream of "repriced" reimbursement demands, it is usually practically impossible for healthcare providers to meaningfully negotiate or pursue dispute resolution with respect to individual claims.

38.     Accordingly, any "negotiation" with MultiPlan starts from the position of MultiPlan's collusive offer to radically underpay healthcare providers for their services, and invariably ends with MultiPlan forcing the HCP to capitulate to an extreme underpayment.

39.     Even worse, as a condition of accepting the artificially suppressed rate, MultiPlan forces the HCP to forego seeking reimbursement from any other source, precluding any mitigation of damage and cementing the harm caused by the collusive underpayment. If the HCP refuses the

---

[14]     *See infra*, ¶¶51-53.

[15]     Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, THE NEW YORK TIMES, Apr. 7 2024, updated Apr. 9, 2024, https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (The process has been described as "not a real negotiation." Offers are known to come with "all-caps admonitions and deadlines just hours away. Accept and receive prompt payment; refuse and risk an even lower payout. Practices and billing specialists said this often wasn't an empty threat.")

artificially suppressed rate, it is virtually certain that it will not be paid at all for OON healthcare service.

40.     MultiPlan then takes a cut of the money that the Insurer Co-Conspirator or other payor withholds from the HCP.[16]

## ANTICOMPETITIVE EFFECTS

41.     The results of MultiPlan's anticompetitive scheme are jarring.   MultiPlan boasts that its repricing tools generate billions of dollars annually in "savings" by forcing providers to accept 61-81% underpayments on their OON reimbursement claims.

42.     By 2020, MultiPlan was using its repricing tools to underpay ***hundreds of thousands of OON claims per day*** for hundreds of insurers, resulting in a total underpayment of at least $19 billion per year, but likely more, to HCPs.[17]

43.     The effects of MultiPlan on the OON reimbursement market are evidenced by Insurer Co-Conspirators' "ceiling" rates.  As part of their initial onboarding, MultiPlan works with subscribers to select a maximum rate at which the payor will reimburse OON services.  This ceiling rate is often referred to as a multiple, such as 250%, of the Medicare reimbursement rate.

44.     During the onboarding process, MultiPlan actively advises new payor subscribers to set their ceiling rates in line with the rates being charged by their competitors, and actually tells their largest subscribers what their competitors' ceiling prices are.

45.     Over time, MultiPlan has actively encouraged each of the Insurer Co-Conspirators to lower their ceiling prices.  As a result of this coordination, despite some setting ceilings of 500%

---

[16]     MultiPlan's co-conspirators pay a 5-7% fee for using the repricing tools.   Thus, MultiPlan is incentivized like a typical buyer's agent, in that the more MultiPlan's tools allow Insurer Co-Conspirators to suppress OON service payments to HCPs, the more revenue MultiPlan generates.

[17]     Churchill Capital Corp III, Proxy Statement Schedule 14A (Form DEFA14A), (Aug. 19, 2020), https://www.sec.gov/Archives/edgar/data/1793229/000110465920096934/tm2028994-2_defa14a.htm.

of Medicare or more before or upon joining MultiPlan, Insurer Co-Conspirators have now all set their ceiling rates between 250-500% of Medicare reimbursement.

46.     Plaintiffs have provided OON services to one of more of the Insurer Co-Conspirators and has had OON claims repriced by MultiPlan.  To illustrate how MultiPlan's repricing tools work, Plaintiffs provide the following example: a person insured through one of MultiPlan's competitors receives medical services from Plaintiffs.  If Plaintiffs do not have a pre-existing contract with the insurer that governs the cost of these services, under state insurance regulations, the insurer is still required to pay Plaintiffs for the services rendered.  Plaintiffs provide services to the patient, then submit a claim to the patient's insurer detailing Plaintiffs' charges for the services performed.  But, instead of simply paying Plaintiffs' claim itself, the insurer turns the claim over to MultiPlan, who then runs the claim through its analytic tools to "reprice" the claim pursuant to the agreement between MultiPlan and the insurer.  After its tools have run their course, MultiPlan reprices the claim, offering a take-it-or-leave-it partial payment for Plaintiffs' services.  If Plaintiffs do not accept MultiPlan's repriced amount, the best it can hope to recover from negotiations with MultiPlan is still a substantial underpayment of its submitted claim.

47.     Insurer Co-Conspirators claim the billions of dollars they are withholding from healthcare providers every year allows them to reduce patients' healthcare costs.  This is patently false.  From the inception of MultiPlan's conspiracy, it attempts to hide behind a fake façade of combatting HCP overbilling.  However, during the span of the conspiracy, Americans' health insurance and health care costs have continued to radically skyrocket.  The money that MultiPlan's tools allow Insurer Co-Conspirators to withhold from HCPs does not go to patients; it goes to the Insurer Co-Conspirators, their investors, and their executives.

48.     MultiPlan created and continues to facilitate an ongoing conspiracy with the Insurer Co-Conspirators throughout the United States, the function of which is to bamboozle HCPs out of billions of dollars per year.

49.     The conduct alleged here is per se illegal; Insurer Co-Conspirators as actual or potential competitors cannot artificially suppress the prices that they will pay for services by agreeing to all use the same method for calculating the offered repayment. Plaintiffs and members of the Class have suffered, and continue to suffer, damages due to systematic suppression of OON reimbursement rates.

50.     But for the anticompetitive scheme to fix and artificially suppress reimbursement rates for OON healthcare services, Plaintiffs and members of the Class would have received fair and competitive reimbursements for their OON services.

## MARKET ALLEGATIONS

51.     The relevant market is the market for OON reimbursements paid by commercial insurers to HCPs in the United States.  The relevant geographic market is not smaller than the United States because healthcare providers can practicably and do turn to commercial insurers located in other parts of the country for reimbursement of OON services.  Healthcare providers can choose to file claims on behalf of their OON patient and are not bound by the patient's contract with his or her health insurer.  The United States' healthcare industry, including the market for reimbursement of OON services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries and is subject to a variety of unique federal and state laws and regulations that apply only in the United States.  Medical providers in the United States cannot reasonably turn to payors in other countries – where private medical insurance is uncommon or

non-existent and nearly all medical care is administered as part of a comprehensive government program – to be reimbursed for OON medical services.

## I.       THE OON REIMBURSEMENT MARKET IS SUSCEPTIBLE TO COLLUSION

52.      MultiPlan's subscribers, including Insurer Co-Conspirators, collectively hold dominant power in the relevant market.  Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to curb out-of-network reimbursement payments.  MultiPlan tools price at least 90% of the relevant market,[18] with the Insurer Co-Conspirators alone accounting for more than 60% of the market.

53.      The high market concentration in the health insurance market,[19] along with the way in which health insurance is provided, ensures that healthcare providers cannot seek an alternative to MultiPlan repriced reimbursements.  HCPs have no choice when seeking payment for OON services they have provided to a patient.  Frequently their only option for reimbursement is to submit a claim to the patient's insurance company.  If that insurer is a member of the MultiPlan conspiracy – and the vast majority are – the healthcare provider has no choice but to seek reimbursement from a MultiPlan-repriced claim.

54.      Entering the American health insurance commercial reimbursement market is hindered by high barriers to entry.[20]  New entrants must be able to bear massive expenditures of

---

[18]      MultiPlan's automated OON reimbursement suppression tools face almost no competition.  MultiPlan's main competitor, Zelis, processed around 2 million claims for repricing in 2022.  MultiPlan processed 546 million claims that same year.  Using claims processed as a measure of market power, this would mean MultiPlan holds over 99% of the market.

[19]      A recent study published by the American Medical Association examined the market concentration of the health insurance market, breaking the market up according to Metropolitan Statistical Markets, or MSAs.  It found that 95% of the health insurance MSAs were highly concentrated.  In 48% of the MSAs, a single health insurer controlled more than 50% of the market.

[20]      MultiPlan's tools are also protected by significant barriers to entry.  For an insurer or third party to develop a competing repricing service, a new entrant would need to spend copious amounts of money to develop source code and algorithms that effectively reprice OON claims without infringing MultiPlan's patents, develop contractual relationships with the hundreds of commercial insurance networks, and commit significant resources to consistently

time and money, required to develop a robust network of healthcare providers large enough to compete as a commercial healthcare insurer. Even without developing an insurance network, there are enormous capital outlays required to operate as a commercial healthcare payor. Entrants then face the challenge of contending with the economies of scale that large incumbent insurers possess. Obtaining name recognition in an industry occupied by longstanding and well-known major players presents an additional hurdle.

55.     There is also an actuarial risk for new health insurance networks. If they cannot balance claims paid and revenue generated through premiums or network access fees, their capital reserves can quickly deplete.

56.     Even if a new entrant to the market experiences initial success, it may not be able to survive long enough to see a return and develop a base of business to allow it to effectively maintain its insureds. Any such new entrant would need to generate enough business fast enough to effectively spread its risk.

57.     Furthermore, a new entrant to the market would be charged with receiving accreditation in every state in which it seeks to operate – functionally, all 50 states plus Washington D.C. – must ensure it is in compliance with all applicable federal and state laws, and must assemble what is an expensive team of experts to remain up to speed on all of the latest developments in the various applicable laws and regulations.

58.     These barriers to entry further solidify the dominance of the members of the MultiPlan conspiracy alleged herein by ensuring that any entity which tries to enter the market but

improving its repricing algorithms and software. As a result, it is unlikely that any company could effectively disrupt MultiPlan's repricing scheme in the short term.

rejects MultiPlan's price-fixing scheme cannot undermine the conspiracy members' ability to impose repriced reimbursement rates on healthcare providers for out-of-network services.

## II.      IN THE CONTEXT OF THE MARKET, INSURER CO-CONSPIRATORS HAVE ACTED AGAINST THEIR SELF-INTEREST

59.      The agreements between MultiPlan and the Insurer Co-Conspirators are against the Insurer Co-Conspirators' self-interest, absent conspiracy.  If a single insurance provider chose to enter into an agreement with MultiPlan and shift away from the traditional UCR methodology to drastically underpay OON claims, healthcare providers would refuse to treat patients subscribing to that provider when possible – *i.e.*, in non-emergency situations.  It follows that the health insurance provider would then experience serious diminishment in the value and breadth of their insurance offerings and a quick diminishment in numbers of subscribers.  More, it would be less likely to bring healthcare providers in-network, further reducing its network's value and potential earnings.

60.      The single contracting insurance provider would also likely be forced to undergo lengthy and expensive repricing negotiations after facing pushback from providers.  But when numerous providers enter a conspiracy to reprice claims, it becomes less effective for healthcare providers to negotiate due to the volume of repriced offers.

## III.     MULTIPLAN AND INSURER CO-CONSPIRATORS HAVE A MOTIVE TO CONSPIRE

61.      Multiplan and Insurer Co-Conspirators have a financial motive to suppress reimbursement payments for OON healthcare services.  MultiPlan is compensated like a buyer's agent: it gets paid a percentage of the "savings" it generates for Insurer Co-Conspirators – and thus it only makes money if the conspiracy members are successful in suppressing OON reimbursement payments.

62.     When Insurer Co-Conspirators would process claims using FAIR Health,[21] the Insurer (or MultiPlan) did not collect any fee – but when an Insurer Co-Conspirators used MultiPlan, both collected a significant fee.

63.     Indeed, Insurer Co-Conspirators generate enormous fees in the same way – they charge their insureds a percentage of the same "savings", often generating total fees that are 50-100% of the amounts HCPs are being paid for the actual service.[22]

64.     The following illustration shows how MultiPlan's payor-customers' "incentives are completely aligned" with its own, as MultiPlan itself stated in a presentation to investors: if a doctor bills $1,000 for services but accepts the $500 payment advised by MultiPlan, then a $500 difference exists between the billed amount and the amount actually paid.  MultiPlan charges the insurance company a fee for forcing this reduced payment on the provider, generally between 5-7%, or $25-35.  Meanwhile, the insurance company charges its customer a processing fee, generally between 30-35%, or $150-175, for obtaining these "savings."  If MultiPlan can suppress reimbursements even further, then MultiPlan and the insurance companies reap even bigger rewards.  If the doctor accepts $200 on the $1,000 bill based on the rate advised by MultiPlan, then MultiPlan and the insurance company take a cut of the $800 difference between the billed amount and amount paid.  This results in fees for MultiPlan ranging from $40-56 and $240-280 for the insurance companies.

65.     Indeed, sometimes Multiplan and Insurer Co-Conspirators suppress payments to healthcare providers so much that the fees that MultiPlan and the Insurer Co-Conspirators charge for these "savings" exceed the amount the provider receives for providing medical care.  For

---

[21]     *See infra*, ¶¶76-88.

[22]     UHC generates about $1B annually in these "processing fees."  A union health plan for about 1,500 Arizona electricians paid $2.6 million in fees to Cigna in 2019.

instance, when a facility providing outpatient substance abuse treatment received $134.13 on a claim, Cigna, the payor, received $658.75 – almost five times as much – as a processing fee. MultiPlan received $167.48 – more than the provider – for its role in suppressing the claim. Court records show this pattern repeats itself frequently. Ultimately, therefore, while Cigna received $4.47 million in processing fees from employers related to addiction treatment claims in California, the providers received only $2.56 million. MultiPlan received $1.22 million for its role in repricing those claims.

66.     The Insurer Co-Conspirators also have a motive to conspire with MultiPlan to avoid the legal issues like those created by their use of Ingenix. For instance, in an internal email, Cigna Chief Risk Officer Eva Borden explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)." Instead, it "need[ed] someone (external to Cigna) to develop acceptable" reimbursement rates. MultiPlan filled this need.

## IV.    MULTIPLAN AND INSURER CO-CONSPIRATORS HAVE HAD OPPORTUNITIES TO CONSPIRE

67.     Multiplan and Insurer Co-Conspirators have ample opportunities to conspire, including through MultiPlan's facilitation of private communications among competing insurance networks.

68.     In 2017, the same year the Multiplan and Insurer Co-Conspirators began the conspiracy, MultiPlan, UHC and Humana came together to form a new industry partnership known as the Synaptic Health Alliance. ("SHA"), an organization dedicated to leveraging blockchain technology to "tackl[e] the challenge of accurate and efficient provider data management and sharing." To do so, SHA created a "cooperatively owned" data exchange to "collect and share changes to provider data." With this venture, MultiPlan, UHC, Humana, and others are developing

an invitation only platform comprising technology enabling "***approved participants to blur industry lines to share and exchange information in a cooperatively-owned, synchronized, distributed ledger***, addressing administrative cost and data quality issues that impact all stakeholders."   By creating an entity specifically for sharing sensitive data, Multiplan and Insurer Co-Conspirators have not only developed a tool to facility the conspiracy, but they also created infinite opportunities for collusion.

69.     MultiPlan's road shows provided numerous opportunities for Multiplan and Insurer Co-Conspirators to conspire.  For instance, in 2019, major health insurance executives, including those from the Insurer Co-Conspirators, met in Laguna Beach, California.  At this gathering, MultiPlan executive Dale White professed that "MultiPlan is Magic" and discussed "a few things up [its] sleeve" that might benefit the insurers.

70.     Multiplan and Insurer Co-Conspirators also have opportunities to collude by way of their other industry connections.  For example, many Insurer Co-Conspirators are members of industry associations such as AHIP (formerly "America's Health Insurance Plans").  Aetna, Centene, Cigna, Elevance, HCSC, Humana, and many others are members of AHIP.

71.     AHIP provides that it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."

72.     Numerous of Insurer Co-Conspirators' executives hold positions on AHIP's Board of Directors, including Gail K. Boudreaux, President and CEO of Elevance; David Cordani, Chairman and CEO of Cigna; and Maurice Smith, President, CEO, and Vice Chair of HCSC.

73.     AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in closed-door meetings.  For example, in 2023, MultiPlan sponsored AHIP's Annual Conference.  Upon information and belief, MultiPlan representatives

attended AHIP's 2023 Annual Conference from June 13–15 in Portland, Oregon. These meetings provided abundant opportunities for Multiplan and Insurer Co-Conspirators to conspire.

74. A federal court in California found that entities' overlapping membership in AHIP and participation in AHIP events presented sufficient opportunities to conspire so as to demonstrate a per se horizontal price-fixing agreement.[23]

75. The fact that members of the MultiPlan cartel regularly gather together in closed-door retreats such as MultiPlan's Client Advisory Board meetings, at MultiPlan's road shows, and at industry events such as AHIP's conferences, board meetings, and committee meetings is circumstantial evidence that their parallel conduct is part of a common scheme to suppress reimbursement rates.

## V.    PRIOR COLLUSION

76. It is easier for firms in a market to conspire with one another if they have done so before. The industry participants know one another and know that they can trust each other to conspire and not alert the government to the existence of the cartel. That is the case here.

77. Prior to 2009, some insurers employed tools, similar to those at issue here, aimed at suppressing reimbursement rates for OON healthcare services.

78. This led to the New York Attorney General ("NYAG") conducting a year-long investigation of UHC's subsidiary, Ingenix, a data company that created schedules to help its users – including UHC, Aetna, and Cigna – determine their reimbursement rates for OON care.

79. The NYAG's investigation revealed that competing health insurers were sharing detailed information on their OON claims with Ingenix for it to calculate OON reimbursement

---

[23]    *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1028 (C.D. Cal. 2011).

rates for commercial health insurers. Ingenix's database, according to the investigation, resulted in OON claims being underpaid by 10% to 28%, depending on the service involved, which increased costs for consumers.

80.     On January 14, 2009, UHC settled with the New York Attorney General, agreeing to shut down the Ingenix database and contribute $50 million toward the creation of a new, independent database that would house more aggregated information. This new database became known as FAIR Health.

81.     Other commercial health insurers, including Cigna and Aetna, entered similar settlement agreements with the New York Attorney General. On January 15, 2009, Aetna agreed to end its relationship with Ingenix and pay $20 million toward FAIR Health's development. Similarly, on February 18, 2009, WellPoint, Inc. agreed to stop using Ingenix and contribute $10 million toward the creation of FAIR Health.

82.     UHC's Ingenix scheme also led to class action litigation and class-wide settlements. For example, UHC paid $350 million to settle a class action. As part of the settlement agreement, UHC agreed to use the FAIR Health database for a five-year period of time. Once that limited period lapsed, however, it joined the other Insurer Co-Conspirators in the MultiPlan scheme.

83.     FAIR Health was created as part of an effort to provide transparency regarding health insurance to both consumers and practitioners. It collects healthcare claim records from health insurers around the country – more than 2 billion claims in total – that it includes in its database. FAIR Health makes the results of its efforts available to consumers, researchers, businesses, and more.

84.     Before MultiPlan and its analytical tools launched, FAIR Health was widely used throughout the commercial health insurance industry for pricing out-of-network reimbursements.

But commercial payors – including UHC, Cigna, and Aetna – were only required to use FAIR Health for five years under their agreements with the New York Attorney General's office. When these terms expired in 2014, MultiPlan pounced.

85.     Insurer Co-Conspirators are some of most profitable companies in the world. While generating hundreds of billions of dollars in revenue each year, they maintain healthy margins. Their massive profits generate equally substantial shareholder returns. In 2020, when HCPs were devastated by the COVID-19 outbreak, insurers, like Insurer Co-Conspirators, banked record profits. Several years later, this economic divergence between HCPs and insurers is the new normal. HCPs continue to struggle financially, while insurers' share prices continue to grow.

86.     When the Insurer Co-Conspirators were no longer bound to use the FAIR Health database, they looked for alternative means to suppress OON payments. Yet again, the Insurer Co-Conspirators recognized the value in relying on a third party to develop claim repricing methodologies. For ex-ample, a Chief Risk Officer at Cigna wrote that "[w]e cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)" and that "[Cigna] needed someone (external to Cigna) to develop acceptable rates." That "someone" become MultiPlan.[24]

87.     In 2019, UHC sought to create a "sense of urgency" to persuade companies still using the FAIR Health database to move away from it and sought to help such companies "understand they don't want to be on that program anymore."[25] Indeed, Multiplan and Insurer Co-Conspirators' anticompetitive scheme would prove far more lucrative and far less transparent.

---

[24]     Hamby, *supra* note 15.

[25]     *Id.*

88.     The Ingenix scheme also led to civil settlements of class action lability.  For instance, UHC paid $350 million to settle a class action.  As part of the civil settlement, UHC agreed to use the FAIR Health database for a period of time.  After that time period expired, UHC agreed to join Multiplan and Insurer Co-Conspirators' anticompetitive scheme.

## VI.    INFORMATION EXCHANGE

89.     MultiPlan and Insurer Co-Conspiratorshave agreed to exchange competitively sensitive, non-public data regarding claims submitted by healthcare providers, reimbursement rates made by commercial health insurance companies in response to those submitted claims, and the actual amount paid in response to those claims.

90.     First, the data exchanged is real-time pricing data, transmitted to MultiPlan automatically and expeditiously through electronic data links from its health insurance clients. Second, the data exchanged is specific to commercial insurance claims.  Third, the data exchanged is not publicly available – although hospitals do publish some pricing information online, it is not updated in real-time. Fourth, the data is granular and unblinded – meaning that MultiPlan knows exactly what its competitors are charging for specific medical services and procedures.

91.     Here, MultiPlan uses this data to explicitly share confidential pricing information between Multiplan and Insurer Co-Conspirators in order to fix prices.  As discussed previously, when seeking to establish UHC's OON reimbursement rates, MultiPlan told UHC that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor."

92.     In a competitive marketplace, competing health insurers, such as the Insurer Co-Conspirators, would not risk sharing individual, real-time, and competitively sensitive pricing information with their rivals. Nor would competitors pay millions of dollars to MultiPlan while concurrently sharing their competitively sensitive data with MultiPlan absent an agreement to

restrain competition. The data exchange operated by MultiPlan and Insurer Co-Conspirators is more consistent with an anticompetitive agreement than a competitive market. Therefore, this type of information exchange is circumstantial evidence of a cartel agreement among competitors. Multiplan and Insurer Co-Conspirators' information exchange is exactly the type of information exchange that the courts have recognized is likely to have anticompetitive effects. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."); *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001) (Sotomayor, J.) ("Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive.")

## ANTITRUST INJURY

93. Plaintiffs and the Class have suffered antitrust injury as a result of MultiPlan's anticompetitive scheme. As detailed herein, Multiplan and Insurer Co-Conspirators' actions directly harmed Plaintiffs by forcing them to accept artificially suppressed reimbursements for healthcare services far below what they would receive in a competitive market. This conspiracy directly damages Plaintiffs' business and property and restrains competition in the market for OON reimbursement for healthcare services paid by commercial payors.

94. Insurer Co-Conspirators accept MultiPlan's repricing tools' recommended reimbursement over 95% of the time. In doing so, Insurer Co-Conspirators functionally outsource OON reimbursement rate setting to MultiPlan. Thus, MultiPlan is a communal pricing calculator amongst the Insurer Co-Conspirators that relies on practically real-time, shared confidential, proprietary competitor information to fix reimbursement rates, in over 95% of instances, at artificially deflated, suppressed levels.

95.     Even in those rare instances where the Insurer Co-Conspirators do not defer completely to the MultiPlan provided reimbursement rate, that artificially suppressed rate still affects prices because it artificially lowers the baseline reimbursement rate from which the Insurer Co-Conspirators ultimately base their reimbursement rates.

96.     The use and application of MultiPlan's claim repricing tool also sabotages the competitive process by depriving the market of independent decision making and replacing it with decision making on prices by one shared pricing entity.     *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) ("'Concerted activity inherently is fraught with anticompetitive risk' insofar as it 'deprives the marketplace of independent centers of decision making that competition assumes and demands.'")

97.     Due to MultiPlan and Insurer Co-Conspirators artificially suppressing OON reimbursement rates, Plaintiffs have sustained and continues to sustain massive economic losses, the full amount of which they will calculate after discovery and prove at trial.

98.      Plaintiffs are efficient enforcers of the antitrust laws with respect to the MultiPlan cartel.  Plaintiffs were directly injured when they were underpaid for submitted out-of-network claims due to the conspiracy alleged herein. The damages that Plaintiffs suffered are not contingent or speculative.

99.     But for the anticompetitive scheme to fix and artificially suppress OON reimbursement rates for healthcare services, Plaintiffs would have received fair and competitive reimbursements for its OON services.

## FRAUDULENT CONCEALMENT

100.    From the inception of the MultiPlan anticompetitive scheme through the present, Multiplan and Insurer Co-Conspirators have affirmatively and fraudulently concealed the

existence of their anticompetitive scheme from Plaintiffs by various means and methods. Plaintiffs therefore had neither actual nor constructive knowledge of the facts giving rise to their claim for relief. Plaintiffs did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of Multiplan and Insurer Co-Conspirators' conspiracy until shortly before filing this Complaint.

101.    Multiplan and Insurer Co-Conspirators collude by entering into agreements to reduce reimbursement payments to providers. Plaintiffs are not a party to those agreements and did not access, and could not have reasonably accessed, the underlying terms that would have alerted Plaintiffs of a potential antitrust claim. Multiplan and Insurer Co-Conspirators engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiffs on inquiry notice.

102.    Multiplan and Insurer Co-Conspirators colluded by entering into agreements to reduce reimbursement payments to providers. Plaintiffs are not a party to those agreements and did not access, and could not have reasonably accessed, the underlying terms that would have alerted Plaintiffs of a potential antitrust claim.

103.    Multiplan and Insurer Co-Conspirators intentionally conducted their anticompetitive scheme outside of public scrutiny:

> a.    Insurer Co-Conspirators privately submitted their own claims data to MultiPlan, and MultiPlan in turn used its proprietary repricing tools, the details of which remain confidential, to recommend reimbursement rates;
>
> b.    Multiplan and Insurer Co-Conspirators regularly attended invitation-only industry events, including events held and sponsored by MultiPlan, where they discussed behind closed doors how MultiPlan's repricing tools allowed

them to reduce costs by suppressing out-of-network reimbursement rates; and

c.     Multiplan and Insurer Co-Conspirators had private communications and meetings to discuss out-of-network claim repricing, MultiPlan's repricing tools, and use of those tools, including by each Insurer Co-Conspirator's competitors.

104.     Although MultiPlan claims to provide an explanation of its pricing methodology to providers, it and the other Insurer Co-Conspirators intentionally hid from non-conspirators, including Plaintiffs, that they outsourced pricing of OON reimbursement claims to a shared pricing system that used Insurer Co-Conspirators' real-time, non-public claims data and combined it with their competitors' real-time, non-public claims data to set OON reimbursement rates.

105.     Plaintiffs exercised reasonable diligence at all times, but they had no reason to suspect wrongdoing by MultiPlan until at the very earliest: (a) VHS Liquidating Trust filed a California law antitrust claim against MultiPlan in San Francisco County Superior Court on September 8, 2021 and (b) a March 7, 2022 article raised questions regarding MultiPlan's antitrust compliance. *See MultiPlan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say*, THE CAPITOL FORUM (Mar. 7, 2022), https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could-raise-antitrust-concerns-experts-say/. These two events reasonably put Plaintiffs on notice that they may have antitrust claims against MultiPlan. Plaintiffs could not have discovered the anti-competitive scheme at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques described above to conceal the existence of the conspiracy.

106. Reimbursement payments to HCPs are not exempt from the antitrust laws, and thus, before these recent events, Plaintiffs reasonably considered the market for reimbursement payments from commercial healthcare networks to be a competitive industry.

107. Thus, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of MultiPlan's agreements with other commercial insurance networks.

## CONTINUING VIOLATION

108. Plaintiffs' Sherman Act claims, which are subject to a four-year statute of limitations period, are timely under the continuing violations doctrine. The first complaint against MultiPlan alleging an antitrust violation based on a similar factual predicate was filed on August 9, 2023. The anticompetitive scheme alleged above began at least as early as 2017. Each month, Insurer Co-Conspirators and their agents made a payment to MultiPlan pursuant to a written agreement in exchange for access to competitively sensitive information about OON claims submitted by their competitors.

109. This complaint alleges Multiplan and Insurer Co-Conspirators set artificially low rates of reimbursement for OON healthcare services derived from a pool of competitively sensitive transaction data within the four-year statutory period.

110. As a result of the anticompetitive scheme challenged in this Complaint, throughout the Class Period and to the present, Multiplan and Insurer Co-Conspirators were able to and did artificially suppress reimbursement payments to HCPs for OON healthcare services.

111. Plaintiffs and Class members accepted these artificially suppressed payments caused by the conduct in this Complaint throughout the Class Period.

112.    Thus, each artificially suppressed payment made to a HCP constituted an overt act causing injury to the Class.

113.    Accordingly, Plaintiffs and members of the proposed Class were injured and may recover for damages suffered at any point during the conspiracy.

114.    Multiplan and Insurer Co-Conspirators' unlawful acts and practices described above continue to this day.

## CLASS ALLEGATIONS

115.    Plaintiffs bring this action on behalf of themselves and the following Class under Federal Rule of Civil Procedure 23(a) and (b)(3) seeking damages as well as equitable and injunctive relief, on behalf of the following class:

> All persons or entities whom one or more of Insurer Co-Conspirators have reimbursed for out-of-network healthcare services using MultiPlan tools from no later than July 1, 2017, until Multiplan and Insurer Co-Conspirators' unlawful conduct and anticompetitive effects cease.

116.    Specifically excluded from these Class are Multiplan and Insurer Co-Conspirators; the officers, directors, or employees of Multiplan and Insurer Co-Conspirators; any entity in which Multiplan and/or any Insurer Co-Conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of Multiplan and Insurer Co-Conspirators.  Also excluded from both Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

117.    The Class is so numerous as to make joinder impracticable.  Plaintiffs do not know the exact number of Class members, but the above-defined class members are readily identifiable and are ones for which records should exist.  Plaintiffs believe that due to the nature of the product market, there are at least hundreds of members of the Class in the United States.

118.    Common questions of law and fact exist as to all members of the Class.  Plaintiffs and the Class members were injured by the same unlawful price-fixing conspiracy, and Multiplan and Insurer Co-Conspirators' anti-competitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate.  Common issues of fact and law include, but are not limited to, the following:

a.    whether Multiplan and Insurer Co-Conspirators engaged in a combination or conspiracy to artificially suppress, fix, and maintain the reimbursement rates paid to HCPs rendering OON healthcare services.

b.    the duration of the conspiracy alleged herein and the acts performed by Multiplan and Insurer Co-Conspirators in furtherance of the conspiracy;

c.    whether such combination or conspiracy violated the federal antitrust laws;

d.    whether the conduct of Multiplan and Insurer Co-Conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and Class members;

e.    whether Multiplan and Insurer Co-Conspirators caused Plaintiffs and the Class to suffer damages in the form of underpayments for OON healthcare services;

f.    the appropriate class-wide measure of damages; and

g.    the nature of appropriate injunctive relief to restore competition in the market for reimbursement of OON healthcare services.

119.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs and all Class members are similarly affected by Multiplan and Insurer Co-Conspirators' unlawful conduct in that they received artificially suppressed reimbursement for OON health care services rendered.

120. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other Class members.

121. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

122. The common questions of law and fact relative to the Class members predominate over any questions affecting only individual members, including issues relating to liability and damages.

123. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Multiplan and Insurer Co-Conspirators.

124. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**CLAIM FOR RELIEF**

**COUNT 1**
**VIOLATIONS OF SHERMAN ACT 15 U.S.C. §1**

125.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

126.     Beginning at least as early as July 1, 2017, and continuing through the present, Multiplan and Insurer Co-Conspirators entered and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

127.     The contract, combination, or conspiracy consisted of an agreement among the Multiplan and Insurer Co-Conspirators to artificially suppress, fix, stabilize, and maintain at artificially low levels the reimbursement rates paid to HCPs for OON healthcare services and involved the exchange of competitively sensitive information between and among Multiplan and Insurer Co-Conspirators, causing anti-competitive effects without sufficient procompetitive justifications.

128.     Plaintiffs and members of the Class have been injured and will continue to be injured in the form of underpayments for OON healthcare services.

129.     Multiplan and Insurer Co-Conspirators' anticompetitive conduct had the following effects, among others:

a.     Competition restrained or eliminated with respect to reimbursement payments for OON healthcare services;

b.     The rate of reimbursement for OON healthcare services has been fixed, stabilized, and maintained at artificially low levels;

    c.      HCPs have been deprived of free and open competition among commercial payors; and

    d.      HCPs have been compelled to agree to one-sided, non-negotiable reimbursement rates they would not be subject to in a free and competitive market.

130.    This conduct is unlawful under the per se standard. Multiplan and Insurer Co-Conspirators' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

131.    Plaintiffs and members of the Class are entitled to treble damages, attorneys' fees and costs, and injunction against Multiplan and Insurer Co-Conspirators to end the ongoing violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, once certified;

B.    The Court adjudge and decree that the acts of Multiplan and Insurer Co-Conspirators are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Multiplan and Insurer Co-Conspirators be

adjudged to have been a per se violation (or alternatively, illegal as a quick look or full-fledged rule of reason violation) of antitrust and competition laws as alleged above;

C.    The Court permanently enjoin and restrain Multiplan and Insurer Co-Conspirators, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    The Court enter judgment against Multiplan, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.    The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

132.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: May 13, 2024                    Respectfully submitted,

   */s/ Joseph P. Guglielmo*
Joseph P. Guglielmo (N.D. Ill. Bar No. 2759819)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

Telephone: 212-223-6444
jguglielmo@scott-scott.com

Patrick J. Coughlin (*pro hac vice* forthcoming)
Carmen Medici (*pro hac vice* forthcoming)
Jonathan Smallwood (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-798-5319
pcoughlin@scott-scott.com
cmedici@scott-scott.com
jsmallwood@scott-scott.com

Patrick McGahan (*pro hac vice* forthcoming)
Michael Srodoski (*pro hac vice* forthcoming)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S. Main St.
Colchester, CT 06415
Telephone: 860-531-2606
pmcgahan@scott-scott.com

Christopher M. Burke (*pro hac vice* forthcoming)
Walter Noss (*pro hac vice* forthcoming)
Yifan (Kate) Lv (*pro hac vice* forthcoming)
**KOREIN TILLERY PC**
707 Broadway, Suite 1410
San Diego, CA 92101
Telephone: 619-625-5620
cburke@koreintillery.com
wnoss@koreintillery.com
klv@koreintillery.com

George A. Zelcs (*pro hac vice* forthcoming)
Randall P. Ewing, Jr. (*pro hac vice* forthcoming)
Chad E. Bell (*pro hac vice* forthcoming)
Labeat Rrahmani (IL Bar No. 6340286)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
cbell@koreintillery.com
lrrahmani@koreintillery.com